The third case to be argued today is United States v. Mauricio Marchan, No. 18-2758. And we'll hear first from Mr. Levitt. Thank you, Your Honors. Counsel, may it please the Court, on behalf of Mr. Marchan, the appellant in this matter, my name is Ryan Levitt, and I, along with Damon Tronis, represented him both at trial and on this appeal. On his behalf, we've submitted three independent issues, which, before even assessing their cumulative effect, I would respectfully submit all require this Court to vacate his conviction and remand for a new trial. The one I'd like to start with this morning is actually the third issue we raised regarding the foreign language transcripts. On Mr. Marchan's behalf, we submitted that it was error to allow the jury to receive the foreign language recordings during deliberations, which it had over a defense objection, and after the parties initially agreed at the outset of deliberations that the recording should not go back to the jury during deliberations, as it was never published during the course of the trial. Instead, what was submitted to the jury and introduced at trial without objection and discussed extensively with witnesses during the course of their examination and during was the English language transcript, which was prepared by Dr. Catalina Johnson, an expert who testified in this matter. Just briefly with respect to the law, as this Court knows, in the context of foreign language recordings, the law regarding the relationship between a recording and a transcript sort of flips on its head, right? Usually it's the recording that's the evidence, the transcripts are aids. But when a recording is in a foreign language, it's the transcript that controls. The jury's not allowed to fashion their own interpretation. But the recording is still evidence, and it was admitted into evidence. Agreed, yes. And when the judge sent it back to the jury after they requested it, he again instructed them, as he had at the close of the case, that they were not to use their knowledge of the Spanish language when they listened to it. So how do you get around that instruction? So that instruction, that was just the instructions are presumptions, right? At least on appeal, we presume that the jury followed that instruction. And I think that's not something that's... Do you have any evidence that they did not follow it? Well, I think if we look at the facts, that's an inference we can draw. But you're on appeal, on post-trial, and addressing an evidentiary issue. Well, I think what I'd like to say about it is that in thinking what to say to Your Honors today, the question I ask myself about this question is, if the jury was following its instructions, why would it request access to evidence that it couldn't really independently assess? What about tone of voices? Tone of voices? Yeah. And transcripts take an awful lot of data out of a conversation, right? Well, I think that's part of the issue, too, is that in the transcript, there were portions that were unintelligible, right? So maybe not exactly tone of voices, but things that the expert who formulated the transcript said were inaudible. Why don't you answer my question? Could that be a reasonable use a jury might make of a foreign language recording? I don't think, under the facts of this case, that it is. There wasn't anything related to a speaker's tone of voice. This wasn't a case where someone was making a threat or something like that, where the nature would matter. That may not be from the lawyer's point of view, but who knows what the jury is thinking about? Sure. But it's not something that I would submit was in any way argued between the parties or in any way disputed. Counsel, how does your argument apply about this, in essence, inevitability that jurors will disregard that instruction in cases where, if you go to federal trials in, say, Puerto Rico, everybody on the jury speaks Spanish, witnesses testify in Spanish, and it all gets translated into English for federal court purposes with these instructions. Are those all invalid? That might be a different situation, but Puerto Rico is, of course, in a different circuit. Okay. How about Chicago, where you've got a Spanish-speaking witness on the stand, suppose that's what you've got, and jurors who are more comfortable in Spanish than in English? In this case, we know that we had, I think, at least two jurors who spoke Spanish and the rest didn't. At least that's what they declared on their voir dire. How would your argument apply to the hypothetical that I've posed to you? It would change. It would certainly change. If it was a case where the jury all spoke the same language, I think we'd be back in a situation where the ordinary rule applied, where people in this district, jurors all speak English. In that case, the recordings, the evidence, the transcripts would be the same. Okay. You don't like my hypothetical. I'll keep qualifying it until you answer it. Let's suppose we've got this jury with at least two Spanish speakers on it, and we've got witnesses testifying from the witness stand in Spanish with simultaneous translation and the same instruction. Don't try to do this on your own. Don't trust your own language skills. Just trust the English translation. Does that require a mistrial? Not necessarily. Why not? The difference here is because, in that case, the presumption would hold. There would be nothing to suggest that when the trial court instructed them, don't rely on your own language, that they didn't. But here, the fact that they asked for the recording during deliberations when, as I submit, there's really nothing the recording could provide them when they were required to follow the transcript. One of the issues that came up in this context was probably the biggest issue in terms of discrepancies between the trial testimony from the stand and what was on the transcript was the government informant who testified extensively about this thing called Telos Otros, where he referenced another conversation with Mr. Marchand that happened during the course of the deal. By Telos Otros, he clarified that he meant he was talking about a potential future heroin transaction with Mr. Marchand. But that was nowhere in the recording. And actually what the government did in his direct examination was they kept trying to bring him back to a spot on the transcript where there was an unintelligible portion. And he kept saying, no, no, no, it was in this portion of the transcript where Dr. Johnson picked up everything that was said. It just wasn't there. So what would be wrong with the jury asking for the audio so it could listen as to whether or not they heard that particular phrase? Even the English speakers who have no idea what it means, the informant on the stand testified, I said it, it just wasn't picked up on the audio. So why wouldn't it be logical in assessing credibility for the jury to say, let me see if I can hear that particular phrase. I have no idea what it means, but just the saying of the phrase is what's relevant. So that's pretty much precisely the question, Judge, that the trial court posed while we were discussing whether or not the recording should go back. And a very relevant question given that that was an issue before the jury. Sure, but applying the law that they were given, that they have to follow the transcript, that they can't fashion their own translation. And the fact that in the transcript it doesn't say anything about a future, they wouldn't be able to draw that point just from applying the law to the evidence. That's not the instruction they were given, though. They were told, you may not rely on any knowledge you may have of the Spanish language. Rather, your consideration of the transcript should be based on the evidence introduced at trial. The evidence was the recording that was introduced at trial. And my point is, you don't have to have knowledge of the Spanish language if all you're doing is listening for a phrase. I understand. And I think it comes back to that language about consideration of the transcript. If they did that, if they applied that instruction and they looked at the transcript where there wasn't even an unintelligible portion that he's talking about this critical phase, they would have drawn the conclusion that he didn't say it and that he was lying to the jury when he gave that testimony. But that doesn't have anything to do with their knowledge of the Spanish language. You don't have to know Spanish to listen for that particular phrase. I think I'd risk repeating myself if I just said it again. I think it's following, by applying the law to that specific transcript, they would have had to draw that conclusion anyways and they couldn't have gotten anything from the recording. And the prejudice we discussed, weighing it against the potential benefit, on the other hand, is something that I would respectfully submit is an abuse of discretion. If there's no other questions on that issue, I want to turn briefly just to the first one regarding the motion for a mistrial based on what we submit as improper hearsay. Can you identify, please, on your mistrial motion, what specific statements you are claiming form the basis of this hearsay testimony that caused a mistrial? You have identified a series of statements in your brief. I went back and looked at the transcript where this testimony was elicited and the majority of what you've identified you didn't object to. Where you did object to it, the district court sustained your objection many times and instructed the jury to disregard it. And I think there was only one statement that you've identified where the judge overruled the objection, and that testimony involved pointing to identify the vehicle and saying the person in there was supposed to have the kelogram. That's the only statement based on the ones that you've provided that the court either did not strike or that you objected to. So can you identify beyond that statement what you're relying on? We're relying on sort of all three categories of statements in relation to the motion for mistrial. Not just the objections that weren't sustained. The questions or the hearsay that was elicited in which there wasn't a specific objection, which in isolation, sure, would be plain error. But then also even the ones where the jury was told to disregard that testimony. Are you again going to argue that we can't presume that the jury followed the court's instructions, which the district court here, again, I looked at the transcript. He was very thorough. Every time he sustained your objection, he told the jury, members of the jury, you should disregard this particular testimony or this question and answer. He did. And I'll just say that's why I don't think looking at these, well, I think this happened frequently enough, and essentially from the first witness on throughout the government's case. And it was there every day of trial through almost every, at least every witness testifying substantively about conversations. And I don't want to lose the trees for the forest in talking about these specific objections. Because when you step back and look at them all together, look at the objections that weren't sustained, look at the ones that were. There was one. Again, say objections. I thought there was two, but I won't quibble with you now. And then also the ones that were just maybe the objection came three, four questions into the line. And so I suppose technically planar. But when you look at that wider context and how it colored the case, and especially when you look at, again, I think the context is important regarding the Santiago proffer and how those were withdrawn. I don't think there was any relevant reason, as we sort of discussed in our reply. But, again, I'll just say when you look at the context and you put all those three things together, there's just everyone sort of the phrase ringing the bell. And especially when some objections weren't sustained. Sure, others were. But it's a pretty difficult task to ask the jury to do that. And ultimately, when you look at how it colored the case. Courts ask juries to do that all the time. I understand. Courts, almost every trial something comes out where an objection is sustained and the court appropriately so tells the jury to disregard it. Of course. But I would just add, not usually alongside objections that weren't sustained and the potential hearsay comments that fall under plain error. Are you trying to argue that the district judge should have granted a mistrial on the basis of testimony given without objection? I'm trying to argue that's one piece of it. There were also objections made along the same topic. And some sustained, some not. Because of sustained objections? Putting the context together. We made a motion for mistrial based on the way that testimony and about the prior meetings between the former co-defendant that became a government witness but didn't testify and the informant. Talking about what in essence were co-conspirator statements that didn't actually qualify as co-conspirator statements that were still put forward by the government repeatedly throughout the trial. I think looking at that context in the wider picture, yes. I think it was an abuse of discretion. Do you want to save a minute for rebuttal? I'm sorry, yes I would. Thank you, Judge. Okay. For the government, Mr. Daniel. May it please the court, this court should affirm the defendant's conviction because the defendant received a fair trial. I'll start with the issue of the Spanish language recordings that went back to the jury. The recordings themselves as well as the transcripts were admitted into evidence. Initially the recordings did not go back to the jury. When the jury asked for them, the government agreed that they should go back and that the court should instruct the jury with respect to the Spanish language issue on those recordings and the district court did. There are multiple reasons the jury could have wanted to hear those recordings. For instance, counsel just indicated that there were various unintelligibles that appeared on the transcript. There was some discussion about that. And while jurors could have looked for whether telos oltros was uttered, really the issue is was there portions of the conversation, as the cooperating witness, Pedro Chavez, testified, portions of the conversations that weren't in the transcripts. Simply hearing that would lend credibility to that witness's testimony. Other issues, this transaction took place in a parking lot in January. There are ambient sounds and noises, car alarms, traffic, other things to contend with. All of that is relevant to the context of the transcripts and the translations as well as the credibility and accuracy of the transcripts in the context of the unintelligible statements that appeared on it. For those reasons, the district court did not abuse its discretion in allowing the jury to receive admitted evidence. With respect to the hearsay issue, not every statement made outside of courtroom is hearsay. It also has to be offered for the truth of the matter asserted. In this case, there were meetings that took place prior to the January 4, 2017, transaction. Those meetings, there were participants in those meetings, and what they understood the purpose of those meetings were, were relevant. For example, when the law enforcement officers were meeting with Pedro Chavez, the cooperating source, those meetings had a purpose. So the witnesses testified what the purpose of those meetings were. About their own conversations with Chavez. About their own conversations. Why the law enforcement officer was meeting with Pedro Chavez. For example, task force officer Gomez explained that, I met with this cooperating source to ask him to set up a narcotics transaction. That was the purpose of the meeting, but it's not offered to prove that a narcotics transaction occurred. It's simply why they were meeting. Does that exception, which this court has applied to law enforcement officer testimony, apply to non-law enforcement testimony? What Pedro, it would apply in the sense that, with respect to the exception itself, I'm not sure, with respect to Pedro Chavez and his understanding of why he was meeting, that becomes relevant because it informs his actions. For example, what puts him in a vehicle with Victor Ramirez on January 4, 2017. But relevance isn't the question. The question is hearsay. Understood, Your Honor. So with respect to his prior conversations with, or as the transcript in this case shows, the testimony elicited from Pedro Chavez regarding his prior conversations with either law enforcement officers or Victor Ramirez concerned, did you meet with them and why did you meet with them? It didn't concern anything further. No statements of the other person came in. For example, no questions such as, what did Victor Ramirez say to you in this December meeting? That didn't come in. Rather, the first time a statement from Victor Ramirez comes in is on January 4, 2017, as he's sitting in the vehicle with Pedro Chavez and the district court judge determined that Victor Ramirez uttered a present sense impression. The two were sitting at a stoplight. Victor Ramirez sees a Chevrolet Tahoe. He points at that vehicle and says, that's him. Now the sustained objection, I believe, was the that was him, which you have to consider that at that time when Pedro Chavez is testifying, he now knows who that person is because he met with him. And so it reflects, there are two ways to approach it. As the district court judge explained, they're in a vehicle going to meet someone, and so when one of the persons says, that's the person, it's logic that dictates, oh, that must be the person we're going to meet. But it's also now we're after the fact, and Pedro Chavez has actually met with the defendant in this case and can say that was the guy I went there to meet. And so those statements not offered for the truth of the matter asserted, but what would prove the defendant's guilt in this case was the evidence of what happened in that parking lot. So even if this court were to determine that the district court committed any errors with respect to its rulings on the hearsay objections, you have the fact that Pedro Chavez met in that parking lot with an individual who drove or who caravaned into that parking lot with a white car, meets with Pedro Chavez, tells him that the cocaine is in a white car, makes a phone call, and then has a white car pull up, opens the back door to that white car, and points at a kilogram of cocaine. That is the evidence that's offered to establish the defendant's guilt. The last issue that was raised on appeal was the issue of the cross-examination of the cooperating witness. The government asked the district court to limit that with respect to a mandatory minimum sentence because it would mislead and confuse the jury. So how did Mr. Chevalis avoid a mandatory minimum of how many years by 0.8 grams? 999.2 grams was measured? So it's actually a bit more nuanced than that, Your Honor. That sounds pretty nuanced. Well, nuanced in the sense, Your Honor, that the quantity of cocaine that he had did qualify him for a mandatory minimum sentence of five years imprisonment. The 997.8 or whatever it was, if he had a kilogram or more, it would have bumped him up to a higher mandatory minimum. The way that happened is that's just what he had, Your Honor. I can only charge him with what he had, and that's what came back with. Unfortunately, narcotics dealers are not always accurate, and what they bring is what they bring to the deal. They say it's a kilogram. If it's 995, that's what I'm left with, Your Honor. He's charged by complaint with a mandatory minimum sentence. At the time, my office was operating under something called the Holder Memorandum, which said to look at various factors in whether to charge someone with a mandatory minimum, whether they have a significant criminal history, whether a leader or organizer, whether there are any gangs or violence or something like that involved. None of that was involved in this case. I believe it was in October 2015, Chabelis was charged with a quantity as opposed to an amount, and that's simply because of the Holder Memorandum. He then cooperates with the government, and in January 2017, he conducts this transaction with the defendant. In May of 2017, the government gets, or there's a new memorandum, the Sessions Memorandum issued, and that instructed prosecutors to charge the most serious offense readily provable. What happened is that by that time, Pedro Chabelis had completed his cooperation. He had done what we asked him to do. He simply just had not pled yet, but he had agreed to plead. In implementing the Sessions Memorandum, our office approached defendants with pending cases, and you can see that somewhat in this case, in this record, where you have a superseding indictment against Mr. Marchand, the defendant, because he had not agreed to plead after the Sessions Memorandum came out. The point of this, Your Honor, is that to explain that, to put that before a jury would take multiple witnesses, and it simply was not tied to the defendant's cooperation. What we're talking about here is the defendant's motivation of lie, and the prospect of receiving a reduced sentence is a motivation of lie, and one that the defendant was able to explore while, or during cross-examination. So this mandatory minimum sentence thing, one, it wasn't tied to his cooperation, and two, irrespective of whether it's an objective or a subjective belief, would require significant effort to correct in the sense that it would take witness to explain things that were outside the record, outside the transaction. Wouldn't it be relevant, though, to the cooperator's motivation to testify if the cooperator believed that he was getting a below-mandatory minimum sentence because of his cooperation? It could be, Your Honor, in the sense that it's a reduced sentence, that a further reduction. Well, it could be. I mean, wouldn't it be if you think you're going to face 10 years as a mandatory minimum unless you cooperate with the prosecutors, and if you cooperate, the judge can sentence you below that mandatory minimum. Wouldn't that go directly to the motivation as to why the witness might be testifying? Your Honor, it's a question of degree. At the end of the day, it's still the prospect of a lower sentence that is relevant, and the question becomes whether it would be misleading and confusing to the jury. Why isn't that a determination that the jury should be able to make if this witness was motivated to lie or to assess the witness's credibility in assessing what the amount of the difference in sentence would be if he cooperated versus non-cooperation? Your Honor, I'm not saying it's improper for a jury to determine it. It's not improper for a jury to make that assessment, but the question becomes whether it has a basis in fact. He was stopped from cross-examination, if I recall. I'm sorry, Your Honor? He was stopped with cross-examination on that subject. He was not allowed to cross-examine on the whether a mandatory minimum sentence was something that he said. Isn't the interest, bias, or prejudice of a witness available to everybody cross-examining? Why would it be different in this case? You just decided that it wasn't affecting his interest or bias or prejudice? No, Your Honor. What the witness was able to testify to was that as part of his plea deal, which was in the record, that he understood that he would receive a recommendation from the government for 50% off his advisory guidelines range.  And the guidelines range was lower than the mandatory minimum. Correct. I believe it was 46 months was the low end of the guidelines range, and Pedro Chavez was ultimately sentenced to 23 months or something like that, Your Honor. So he was able to be questioned about that, which was part of his plea agreement. It's important to note that the plea agreement notes that there are no other promises or things like that made to him. That was what was tied to his cooperation, or when he agreed to cooperate. And by the time he testified, the only thing that he had ever been charged with was a quantity, as opposed to a sentence that carried a mandatory minimum. An unspecified quantity. Correct, Your Honor, as opposed to something that triggered a mandatory minimum sentence. If I recall correctly, isn't it correct that the district judge basically said, you're allowed to cross-examine to your heart's content, or at least a fair amount, on the benefits of cooperation, but said getting into this mandatory minimum stuff and the changes from the Attorney General Holder's policies to Attorney General Sessions' policies was only likely to confuse the jury? That's correct, Your Honor. That was the district court's determination, and I agree with it in the sense that, well, for one, it's incorrect and misleading because it wasn't tied to his cooperation, but then to have to present evidence of the Holder Memorandum and the Sessions Memorandum and government charging practices would just confuse and mislead and become a trial in and of itself on a collateral issue because the defendant already had the opportunity to extensively cross-examine him on a 50% reduction recommendation, as well as other benefits that he received in connection with his cooperation, which included being released on bond and receiving deferred action with respect to his immigration status during the course of his cooperation. And so that provided sufficient information for the jury to assess the defendant's motivation to lie, and therefore the district court did not abuse its discretion in limiting cross-examination on this mandatory minimum issue. And so for those reasons, if there are no further questions from the panel, the government would ask that this court affirm the defendant's conviction in the district court's determinations with respect to these evidentiary issues. Thank you, Mr. Daniel. Rebuttal, Mr. Levin. Thank you, Your Honor. Just briefly, a couple points I wanted to mention on the transcript. I just wanted to flag for Your Honors that the government initially agreed that they should go back. I don't know if that was clear. They should not go back. I'm sorry. Before deliberations, they agreed that the recording should not go back. Thank you. The second point on Pedro Chavez's credibility, again, I submit they had to derive that from the transcript, that it was not there. And I'd also point out that I believe it's cited in the brief. I can't tell you as I stand here, but there was a point where the jury was out, where the parties were discussing, I think, instructions maybe, and the trial court specifically asked the government, did he say that? And they agreed he didn't say that. And certainly in their closing argument, or anywhere in the argument, they never referenced him saying such a thing. As to the cross-examination question, I just want to point out, I think it's important to recognize the district court precluded that evidence based on the possibility of juror confusion as a 403 issue. Trent and this whole body of circuit split is about whether or not the confrontation clause requires bringing out the precise number of that mandatory minimum. We disagree very much whether or not, and through what means, Pedro Chavez was able to avoid a mandatory minimum. And I'll just leave it at saying we'll never know because we, Judge Bauer, we never had that opportunity at all to ask him about it, nor did the government attempt to draw that sting on direct examination either. So thank you, Your Honors. It's been a privilege. And I just ask that you reverse the conviction. Thanks again. Thank you, Mr. Levitt. Thanks to all counsel. The case will be taken under advisement.